**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 16 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

CHARLES ANTHONY PERRY, also
known as CHARLES PERRY,

     Defendant-Appellant.

No. 00-6238
(D.C. No. 99-CR-087-T)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **EBEL**, **ANDERSON**, and **MURPHY**, Circuit Judges.

Charles Perry challenges his conviction and sentence on three drug-trafficking counts. We exercise jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

## BACKGROUND

A federal jury sitting in Oklahoma convicted Perry of conspiring to possess with intent to distribute cocaine base ("crack"), maintaining a place for the purpose of distributing or using crack, and distributing crack. Consequently, we must view the evidence in the light most favorable to the jury's verdict, see United States v. Lahue, 254 F.3d 900, 904 n.1 (10th Cir. 2001).

Beginning in late 1996 and early 1997, Perry and his girlfriend, Iris Jackson, became the center of an investigation into drug trafficking in Elk City, Oklahoma. Perry was an active duty member of the military, stationed at Fort Sill, Oklahoma. His primary residence was 1314 Northwest Irwin, Apartment 209, Lawton, Oklahoma.[1]

Perry would visit Elk City almost every weekend and stay with Jackson. He would bring crack and he and Jackson would sell or give it to numerous customers and friends. Perry introduced Judy Wiseman-Salem ("Wiseman"), a friend of Jackson, to crack. Wiseman began to smoke crack regularly, often purchasing from Perry. Wiseman smoked crack at Perry's apartment in Lawton after she and Jackson had gone down to see Perry for the weekend. When Perry

---

[1]Fort Sill is on the north side of Lawton, and Lawton is about 120 miles southeast of Elk City.

and Jackson were unavailable to answer the front door, often they would instruct Wiseman to fill the orders for crack from customers.

Jackson's friend and first cousin, LaTonya Morris, testified that early in Perry's relationship with Jackson, when the three of them were at Perry's apartment in Lawton, Perry asked Morris and Jackson if they would sell crack for him. Morris later saw Jackson selling crack in Elk City. Morris further testified that according to Jackson, Perry stated that if he were ever caught with crack he would say it was for personal use.

Other witnesses testified that they bought crack from Perry during the period relevant to the conspiracy.[2] One customer, Sandra Keel, testified that she bought crack more than two hundred times from Perry. Keel had sex with Perry in exchange for crack. She also "paid for" some of her crack by stealing clothing and meat for him; he would tell Keel what type and size of clothing he wanted, and in exchange he would give her "crumbs," i.e., the broken pieces of a crack rock that are left over after cutting up a larger piece with a razor blade. At least two other customers also stole items for Perry in exchange for crack. Another customer fixed Perry's BMW in exchange for crack.

Witnesses also explained that Perry supplied Jackson with most of the crack she sold and that occasionally she would sell Perry's crack for him and then give

---

[2]That period extended from spring/early summer 1992 to May 1998.

the proceeds back to Perry. On at least one occasion, Perry brought a hockey-puck-size piece of crack to Elk City, and he and Jackson cut it into smaller pieces with razor blades to sell to consumers. On another occasion, a customer observed Perry with two "cookies" of crack, i.e., pieces which weigh about one ounce each. At least one witness recounted going to Perry's apartment in Lawton to buy crack from him.

On May 6, 1998, the FBI executed a search warrant at Perry's apartment. Perry was not home, but agents found a plate covered with a white powdery residue and two razor blades under Perry's couch, as well as a plastic bag with a small amount (.27 grams) of crack in one of his kitchen cabinets. While conducting the search, agents reviewed and recorded the names and numbers on Perry's Caller ID box.

A federal grand jury indicted Perry on four counts: (i) conspiring with Jackson and others to distribute in excess of fifty grams of crack in violation of 21 U.S.C. §§ 841(a)(1), 846; (ii) selling approximately two ounces (about fifty-six grams) of crack to Jackson on February 10, 1998 in violation of 21 U.S.C. § 841(a)(1); (iii) knowingly maintaining a place, viz., his Lawton apartment, for the purpose of distributing and using crack in violation of 21 U.S.C. § 856(a)(1); and (iv) distributing crack in violation of 21 U.S.C. § 841(a)(1). A jury trial was held from December 13-20, 1999. At the conclusion of the government's case

and at the close of evidence, Perry moved for judgment of acquittal. The court denied his motion both times. The jury convicted Perry on counts 1, 3, and 4, but could not reach a decision as to count 2. Count 2 was subsequently dismissed.

Before sentencing, Perry reviewed the presentence report ("PSR") and filed written objections. On June 23, 2000, after hearing argument on the objections to the PSR, the district court sentenced Perry to life imprisonment on count 1, and 240 months imprisonment on each of counts 3 and 4, with all terms to run concurrently.

Perry timely appealed, raising six issues:[3]

(1)    Whether 21 U.S.C. § 841 is constitutional in light of Apprendi v. New Jersey, 530 U.S. 466 (2000);

(2)    Whether the district court properly sentenced Perry;

(3)    Whether there was sufficient evidence to convict;

(4)    Whether the district court erred in denying the motion to suppress;

(5)    Whether the district court properly instructed the jury regarding the credibility of witnesses; and

(6)    Whether prosecutorial misconduct occurred.

---

[3]In his appellate briefs, Perry states a seventh issue: Whether Perry's conviction violated the Sixth and Fourteenth Amendments. Perry's discussion of this issue, however, makes clear that he is simply repeating his Apprendi arguments. Thus, we decline to address that issue separately.

**DISCUSSION**

A. <u>Constitutionality of § 841</u>

Perry alleges that 21 U.S.C. § 841 is facially unconstitutional in light of <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000). We recently held to the contrary. <u>See</u> <u>United States v. Cernobyl</u>, 255 F.3d 1215 (10th Cir. 2001).

B. <u>Sentencing</u>

Perry argues that the district court erred in two ways during sentencing. First, he alleges that <u>Apprendi</u> invalidates the sentences he received on each of the three counts for which he was convicted, as well as the sentencing enhancements for possessing a firearm and being an organizer in the conspiracy. Second, he argues that the evidence was insufficient to enhance his sentence for obstructing justice under United States Sentencing Guideline ("USSG") § 3C1.1. We find no reversible error on any of these sentencing issues.

1. <u>Alleged *Apprendi* Errors</u>

Perry acknowledges that he did not raise <u>Apprendi</u> objections during sentencing and thus that these claims are reviewed for plain error only. <u>See</u> Fed. R. Crim. P. 52(b). We may reverse for plain error only when there is: (1) plain (2) error (3) that affects substantial rights and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. See <u>United States</u>

v. Olano, 507 U.S. 725, 732 (1993). The alleged plain error must be judged against the complete record. See United States v. Keeling, 235 F.3d 533, 538 (10th Cir. 2000). In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490.

        a. Count 1

Perry was sentenced to life imprisonment on count 1. Section 841(b)(1)(A)(iii) of title 21 permits a defendant who is responsible for "50 grams or more" of crack to receive life imprisonment. Because the trial occurred prior to Apprendi, the district court instructed the jury that the government did not have to prove that Perry was responsible for a particular quantity of crack. (Jury instruction requiring only that a "measurable amount" be proven).) However, "[a] district court may not impose a sentence in excess of the maximum [of twenty years] set forth in 21 U.S.C. § 841(b)(1)(C) unless the benchmark quantity of cocaine base for an enhanced penalty is . . . submitted to the jury and proven beyond a reasonable doubt." United States v. Jones, 235 F.3d 1231, 1236 (10th Cir. 2000). The government concedes that now, post-Apprendi, the district

court's failure to submit the issue of quantity to the jury was (1) plain (2) error.[4] It argues, however, that Perry is not entitled to relief because the evidence that Perry conspired to distribute in excess of fifty grams of crack was overwhelming and therefore Olano's third and fourth elements are not met. We agree.

Our case law suggests that in some cases, like this one, a defendant may fail to carry his burden on both the third and fourth Olano elements where the evidence is overwhelming. In general, to satisfy the third Olano element, a defendant must demonstrate that the error was prejudicial, i.e., that it "affected the outcome of the district court proceedings." Olano, 507 U.S. at 734. "Where the jury has not found quantity beyond a reasonable doubt and quantity is integral to punishment, a defendant can demonstrate prejudice if the evidence suggests a reasonable doubt on quantity." Keeling, 235 F.3d at 539. Similarly, the fourth Olano element is not satisfied when "the evidence on a misdescribed or omitted element of the offense is overwhelming." Id. at 538.

Perry fails to carry his burden on either the third or fourth elements because he has failed to show a reasonable doubt on quantity such that he would not have been convicted under § 841(b)(1)(A)(iii) (50 grams or more of crack). Put differently, the evidence is overwhelming that Perry and Jackson, to say nothing

_____

[4]The government also concedes that Apprendi applies because this case is still on direct review. See Griffith v. Kentucky, 479 U.S. 314, 321 & n.6 (1987).

of the other members of the conspiracy, distributed in excess of fifty grams of crack over the six-year course of the conspiracy, and Perry has not carried his burden to show the contrary.

One ounce is equivalent to 28.349 grams. See Webster's Third New International Dictionary 1399 (1986). Thus, two ounces of crack satisfies the statutory threshold. Two witnesses, James Keel and Sheree Warren, testified that they each saw Perry with around an ounce of crack on three to four occasions during the six year conspiracy. Victoria Edmondson saw Perry with two one-ounce "cookies" of crack at Wiseman's house. Bonita Ladean Jones testified that she saw Perry bring to Elk City large pieces of crack, at least one the size of a hockey puck.

In addition to these direct sightings, numerous customers testified to buying varying amounts of crack – from "crumbs" to $500 pieces – from Perry almost every weekend over the course of the conspiracy. Furthermore, Perry is also criminally liable for the quantity of cocaine purchased from Jackson. See United States v. Arias-Santos, 39 F.3d 1070, 1078 (10th Cir.1994) (holding that an individual convicted of conspiracy to distribute is liable, under § 841(b), for all amounts handled by co-conspirators that are within the scope of the agreement and reasonably foreseeable to the defendant).

The district court adopted the probation officer's "conservative estimate of [5,103.27 grams as] the total amount of cocaine base obtained by Iris Jackson from [Perry] between 1992 and 1998." This "conservative estimate" of over five thousand grams of crack is more than one hundred times the amount necessary to satisfy Apprendi in this case. This overwhelming evidence of how much crack Perry is legally responsible for leads us to conclude that he has not met the third and fourth Olano elements. Thus, he is not entitled to relief for plain error under Rule 52(b).

b. Count 3

The district court sentenced Perry to twenty years imprisonment on count 3 for violating 21 U.S.C. § 856(a)(1) (maintaining a place for the purpose of distributing or using illegal drugs). Section 856(b) provides that "[a]ny person who violates [856(a)] shall be sentenced to a term of imprisonment of not more than 20 years." Perry's sentence on this count does not run afoul of Apprendi because it did not extend beyond the prescribed statutory maximum. See Apprendi, 530 U.S. at 490; see also United States v. Hishaw, 235 F.3d 565, 577 (10th Cir. 2000) (holding that a defendant whose sentence fell within the statutory maximum was not "prejudiced" for purposes of plain error review of an alleged Apprendi violation).

c. Count 4

For the same reason, Perry's sentence of twenty years for count 4 does not violate the rule in Apprendi. Because the district court did not require the government to prove to the jury a precise quantity of crack attributable to Perry, he was sentenced under § 841(b)(1)(C). See Jones, 235 F.3d at 1236. That sub-section, however, carries a maximum penalty of twenty years in prison. See 21 U.S.C. § 841(b)(1)(C).

d. Firearm and Organizer Enhancements

Perry relies on Justice O'Connor's dissenting opinion in Apprendi to argue that the district court violated due process when it applied the firearm and organizer enhancements to him. He has not persuaded us that the majority rule from Apprendi, which is narrower than Justice O'Connor's arguments about the "logic" of that rule, should be extended. Because these enhancements did not extend his punishment beyond the statutory maximum, there is no Apprendi violation.

2. Sufficiency of the Evidence for Obstruction of Justice Enhancement

The district court assessed a two-level enhancement of Perry's base offense level for obstruction of justice pursuant to USSG § 3C1.1. The court based this enhancement on its findings that Perry contacted Maxine Smith, Iris Jackson's mother and a potential witness, and that he committed perjury when testifying during trial. "We review for clear error the district court's factual findings

- 11 -

supporting the application of a particular guideline and its legal conclusions de novo." See United States v. Chavez, 229 F.3d 946, 954 (10th Cir. 2000).[5]

"The sentencing guidelines mandate a two-point adjustment upward if a defendant 'willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense.' Obstruction of justice includes perjured testimony at trial." Chavez, 229 F.3d at 954-55 (citing USSG § 3C1.1 & cmt. n.4(b).) It also includes unlawfully influencing a witness, "directly or indirectly, or attempting to do so." See USSG § 3C1.1, cmt. n.4(a).

Perry was released on a $50,000 unsecured bond on May 7, 1999. One condition of that bond was that he would avoid all contact with potential witnesses or their family members. Jackson was a potential witness, yet in mid-September 1999 Perry visited Maxine Smith, Jackson's mother, at her home in

---

[5]At the hearing regarding objections to the PSR held June 23, 2000, the district court discussed at length why it believed the enhancement for obstruction of justice applied to Perry. Thus, it appears that Perry objected to the PSR's findings relating to this enhancement. The memorandum included in the record on appeal, however, makes no mention of the PSR's findings on obstruction of justice. Had Perry not objected to the facts on this issue in the PSR, those facts would be deemed admitted, see United States v. Deninno, 29 F.3d 572, 580 (10th Cir. 1994) ("Failure to object to a fact in a presentence report, or failure to object at the hearing, acts as an admission of fact."), and this issue could be disposed of summarily. In an abundance of caution, however, and given that the district court felt the need to address the issue, we proceed on the assumption that Perry did object to the facts in the PSR.

Elk City. Perry gave Smith a copy of the statement Jackson had given to the FBI and asked "Do you want to see what Iris is saying?" As a result of this contact with Smith, Perry's bond was revoked. On appeal, Perry does not challenge these facts or the conclusion that this contact constituted obstruction of justice. Thus, on this ground alone we could affirm the district court's application of the enhancement.

The district court also found that Perry committed "massive perjury" at trial. "A defendant commits perjury for the purposes of [§ 3C1.1] if he gives false testimony concerning a material matter with the willful intent to provide false testimony." United States v. Pretty, 98 F.3d 1213, 1221 (10th Cir. 1996) (quotation marks omitted). The district court summarized: "It's almost easier to list the parts of his testimony that were true than to identify those that were false because of the almost consistent false testimony that he gave during the course of his trial." The court then proceeded to list numerous, specific examples of testimony by Perry that were, according to the court, "directly contrary to substantial evidence, supporting a finding of perjury." Cf. United States v. Massey, 48 F.3d 1560, 1573 (10th Cir.1995) (requiring the sentencing court to make specific findings that the defendant has committed perjury). One example given by the court was that Perry "denied knowing that Iris Jackson was a cocaine dealer" which constituted perjury given the "avalanche of convincing evidence to

- 13 -

the contrary." The court also stated that "[h]is denial of association with drugs, that he never benefitted from crack cocaine as a business activity [was] simply contrary to virtually all of the testimony" at trial. The court lists several more examples in the same vein.

On appeal, Perry rehearses much of the evidence he presented at trial: statements by witnesses that they had never seen Perry with drugs, that Perry had an alibi for various periods of time throughout the period of the conspiracy, that Jackson had access to his apartment, and that Jackson kept company with other drug dealers. None of these statements persuade us that the district court committed clear error in finding that Perry had perjured himself when testifying. Perry asserts that "[a]t trial [he] attempted, in good faith, to defend himself." "Every criminal defendant is privileged to testify in his own defense . . . [, b]ut that privilege cannot be construed to include the right to commit perjury." Harris v. New York, 401 U.S. 222, 225 (1971).

We conclude that the district court did not clearly err when it determined that Perry qualified for the two-level enhancement for perjury under USSG § 3C1.1.

C. Sufficiency of the Evidence

- 14 -

Perry moved for judgment of acquittal both at the close of the government's case and at the close of evidence. See Fed. R. Crim. P. 29 (motion for judgment of acquittal). The district court denied both motions. On appeal, Perry argues that these rulings were in error because, according to him, the evidence at trial raised only "a suspicion of guilt" and proved only "guilt by association" to Jackson. We disagree.

"In reviewing . . . a denial of a motion for judgment of acquittal, this court must review the record de novo to determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." United States v. Wood, 207 F.3d 1222, 1228 (10th Cir. 2000). "We must not weigh conflicting evidence or consider the credibility of the witnesses, but simply determine whether the evidence, if believed, would establish each element of the crime." United States v. Vallo, 238 F.3d 1242, 1247 (10th Cir. 2001) (alterations and quotation marks omitted). "We will not uphold a conviction, however, that was obtained by nothing more than piling inference upon inference, or where the evidence raises no more than a mere suspicion of guilt." United States v. Rahseparian, 231 F.3d 1257, 1262 (10th Cir. 2000) (citations omitted).

Viewed in the light most favorable to the government, the evidence demonstrates that Perry solicited Jackson (and others) to distribute crack for him;

that Perry provided crack to Jackson, who in turn sold it; that Perry himself distributed crack to various people; that crack was discovered at Perry's apartment; and that customers obtained crack from Perry at his apartment. These facts are sufficient to uphold the convictions.

Perry attempts to discredit the witnesses who provided this evidence at trial. This argument is unavailing on appeal because we may not weigh conflicting evidence or consider the credibility of the witnesses. See Vallo, 238 F.3d at 1247. Perry also argues that the crack found in his apartment is consistent with personal use only.[6] In his apartment, agents found a plate covered with a white powdery residue, two razor blades, and a plastic bag containing a small amount (.27 grams) of crack. Testimony at trial indicated this evidence is more indicative of distribution than personal use. First, users generally do not leave crumbs but distributors often trade crumbs to customers for favors. Second, razor blades are used by distributors to both dilute pure cocaine and cut larger pieces of crack into smaller, marketable pieces. Third, the size of the plastic bag (which was introduced into evidence) and the residue on the inside of that bag are more consistent with distribution. Users tend to keep small baggies that can be hidden easily. The bag found in Perry's apartment was large and was thus more

---

[6]We note that Perry's "personal use" defense is what Morris testified Perry would say if caught with crack.

- 16 -

consistent with storing larger quantities of crack. The residue on the inside of the bag indicated that crack was put into it right after the crack was made; crack is made by heating cocaine and if it cools in a bag condensation will form, leaving a film. Finally, conspicuously absent from Perry's apartment were paraphernalia used to ingest crack and any evidence that someone besides Perry had been there. We must view this evidence in the light most favorable to the government and find that it is more than sufficient to show that a rational trier of fact could have found Perry guilty of distribution beyond a reasonable doubt. See Wood, 207 F.3d at 1228.

D. Suppression

Before trial, Perry moved to suppress all the items found in his apartment on the grounds that (i) the affidavit submitted to obtain the search warrant was constitutionally insufficient and (ii) if the search were valid, the agents exceeded the scope of the search by recording numbers from his Caller ID box. The district court held a hearing and subsequently denied Perry's motion. At trial, Perry renewed his objections to admitting these items as evidence. On appeal, Perry re-asserts that the search was invalid for the same two reasons. We disagree.

"[T]he reasonableness of a search under the Fourth Amendment is a question of law which we review de novo." United States v. Finnigin, 113 F.3d

1182, 1184 (10th Cir. 1997). "When reviewing the district court's ruling on a motion to suppress, we accept the court's factual findings unless clearly erroneous, and view the evidence in the light most favorable to the district court's findings." Id.

1. Sufficiency of the Affidavit

"We will give great deference to the magistrate's determination of probable cause, and will uphold that conclusion if the totality of the information contained in the affidavit provided a substantial basis for finding there was a fair probability that evidence of criminal activity would be found." Id. at 1185 (quotation marks omitted).

The affidavit was submitted by Nicholas Manns, the FBI agent working on Perry's case. Manns described the ongoing investigation of drug trafficking in the Elk City area, and noted that Jackson had been identified as a crack seller. Jackson's friend Wiseman told Manns that Perry was Jackson's supplier for most of the time from 1989 or 1990 to 1998, except when Perry was stationed in Korea for a year (1995).[7] Wiseman also described a specific meeting on February 10, 1998, at which Jackson obtained a large bag of crack from Perry in exchange for a large amount of cash. Wiseman stated that she traveled with Jackson to Perry's

[7]Manns noted in the affidavit that Wiseman had given contradictory information about the source of the cocaine she possessed.

apartment nearly every weekend for four to five years up to June 1997 for the purpose of buying crack.

The affidavit also contained information corroborating Wiseman's description of Perry. According to an Army investigator, Charles Perry was enlisted and stationed at Fort Sill, but had been in Korea for a tour of duty. He drove a maroon Mazda pickup. Finally, the affidavit related that Jackson's former sister-in-law, Victoria Jackson, confirmed that Iris's source was a soldier named "Charles" from Fort Sill who drove a red Mazda pickup. Victoria had seen Charles with large quantities of cocaine, and noted specifically one occasion in 1993 or 1994 when he had a briefcase containing several ounces of crack.

We have no trouble concluding that the affidavit was sufficient to provide a substantial basis for finding there was a fair probability that evidence of criminal activity would be found at Perry's apartment, especially when viewed in the light most favorable to the district court's findings. See Finnigin, 113 F.3d at 1184. Moreover, Wiseman's statements were corroborated by both the Army investigator and Victoria Jackson. Cf. United States v. Le, 173 F.3d 1258, 1266 (10th Cir. 1999) ("Consistency between the reports of two independent informants helps to validate both accounts." (alterations and quotation marks omitted)).[8]

_____

[8]The district court noted and rejected both arguments Perry emphasizes in his appellate brief: that Wiseman gave conflicting statements and that Victoria Jackson's information was stale. We believe it acted correctly and see no need to

2. Scope of the Search

"The scope of a warrant is a question of law which we review de novo. When interpreting warrants, this court has adopted a standard of practical accuracy rather than technical precision." United States v. Ortega-Jiminez, 232 F.3d 1325, 1328 (10th Cir. 2000) (citation and quotation marks omitted).

During their search of Perry's apartment, agents saw a Caller ID box[9] attached to Perry's telephone, and they wrote down the information contained in its memory – names, numbers, dates, and times. Perry argues that this exceeded the scope of the warrant.

The warrant allowed the agents to seize, among other things:

Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances; [and]

Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances.

Thus, the warrant authorized both seizure of "records" relating to the distribution of drugs and "papers" reflecting telephone numbers of customers. We believe the district court was correct to find that these passages authorized seizure of the

belabor the point.

[9]In his appellate briefs, Perry calls this a pager. Defense counsel did the same thing below but then admitted to the court that this was a mistake. In its denial of his motion to suppress, the district court noted this error. We are disturbed by Perry's counsel's persistent use of the wrong term, despite numerous corrections.

- 20 -

numbers from the Caller ID box. "[I]n the age of modern technology and commercial availability of various forms of items, the warrant could not be expected to describe with exactitude the precise form the records would take." United States v. Reyes, 798 F.2d 380, 383 (10th Cir. 1986) (finding that a warrant authorizing seizure of "drug trafficking records, ledgers, or writings identifying cocaine customers [and] sources" allowed seizure of cassette tapes containing discussions of drug activities); accord United States v. Meriwether, 917 F.2d 955, 958 (6th Cir. 1990) (holding that a warrant authorizing seizure of "telephone numbers of customers, suppliers, couriers" empowered the officer to seize numbers from a digital pager).

Perry argues that we should extend United States v. Carey, 172 F.3d 1268 (10th Cir. 1999), to the facts of this case. In Carey, police officers received consent to search the defendant's apartment for drug-related items. See id. at 1270. The police seized two computers and obtained a warrant to search them for "names, telephone numbers, ledger receipts, addresses, and other documentary evidence pertaining to the sale and distribution of controlled substances." Id. (emphasis added and quotation marks omitted). While searching the directory of files on the hard drives, a detective found picture files with sexually suggestive names. See id. The detective opened these files and discovered that they contained child pornography. See id. at 1271.

This court suppressed the evidence of child pornography in Carey because it was beyond the scope of the search warrant and not in plain view. See id. at 1273. The Carey panel noted that computers are "likely to contain a greater quantity and variety of information" than other storage methods. Id. at 1275. It held that warrants should therefore specify the type of file to be seized. See id. Because the police were looking for documentary evidence of drug distribution, they had no cause to open the picture files. See id. at 1274. The police would have had to obtain a new warrant to open those files. See id. at 1276.

Carey is inapposite for two reasons. First, in contrast to Carey, here the electronic storage device did not have the potential to store a great variety of information. Indeed, a Caller ID box can provide only the information that the agents sought: names, numbers, dates, and times. Cf. Carey, 172 F.3d at 1275 n.7 (noting that it was discussing only computers, not all contemporary storage media). Thus, there was less risk that the agents would have come across information completely unrelated to the original purpose of the search.

Second, the agents did not seize information for some purpose unrelated to the search warrant, as they did in Carey. Here, the search was for telephone numbers and records in particular. Thus, the search did not exceed the scope of the warrant, as it did in Carey. Under the facts of this case, we see no reason to extend Carey.

Because the search warrant was supported by probable cause and the information from the Caller ID box was within the scope of the warrant, we AFFIRM the district court's denial of Perry's motion to suppress the evidence taken from his apartment.

E. Jury Instructions

Before trial, Perry sought instructions that the jury should both consider a witness's interest in the outcome of the case when assessing that witness's credibility and examine "with greater care" the testimony of an informer. The district court declined to give those instructions, instead giving the following, in relevant part:

> Jury Instruction 17: All evidence of a witness whose self-interest or attitude is shown to be such as might tend to prompt testimony favorable or unfavorable to an accused should be considered with caution and weighed with great care.

> Jury Instruction 19: In this case, the government called among its witnesses alleged accomplices with whom the government has entered into agreements in exchange for the accomplices' cooperation with the prosecution. Such plea bargaining, as it is called, has been approved as lawful and proper, and is expressly provided for in the rules of this court. A plea bargain is one factor you should take into account in evaluating the testimony of a witness if a part of the bargain or a consequence of it is leniency in exchange for cooperation in other cases.
>     The fact that an alleged accomplice who testified in this case may have pled guilty to charges arising out of this same investigation should not, however, be considered as evidence of the defendant's

- 23 -

guilt. Such evidence is admitted solely as it bears on the credibility of that witness.

Perry does not refer us to any place in the record in which he specifically objected to the jury instructions given by the trial court and we could not find any in our independent review. Thus, we review the instructions for plain error. See United States v. Voss, 82 F.3d 1521, 1530 (10th Cir. 1996) ("Although the defendants cite their own proffered instructions, they have not indicated a place in the record in which they objected to the court's instruction. We have also thoroughly reviewed the record in this case and agree that the defendants failed to object. Accordingly, we may only review the district court's instruction for plain error.").

"To determine whether the jury was adequately instructed on the applicable law, we review the instructions in their entirety de novo to determine whether the jury was misled in any way. The instructions as a whole need not be flawless, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them." Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 552 (10th Cir. 1999) (citations omitted). "[N]o particular form of words is essential if the instruction as a whole conveys the correct statement of the applicable law." Webb v. ABF Freight Sys., Inc., 155 F.3d 1230, 1248 (10th Cir. 1998) (quotation marks omitted).

It is clear to us that the district court did not commit plain error by using the above instructions on witness credibility rather than Perry's. The court's instructions adequately conveyed the substance of Perry's requested instructions. In addition, no informer testified at trial, so Perry's second proposed instruction was, at best, superfluous and, at worst, misleading.

We AFFIRM the district court's decision to use its, and not Perry's, jury instructions.[10]

F. Prosecutorial Misconduct

Count 2 charged Perry with distributing two ounces of crack to Jackson on February 10, 1998. At trial, Perry presented an alibi defense by calling as a witness Vevlyn Hayes, who testified that on the night of February 10, 1998, she and Perry were writing and editing two or three of Perry's papers for a college course. When cross-examining Hayes, the government asked whether Perry could have called her as a witness to give this same alibi defense at the civil forfeiture proceeding in which Perry forfeited his pick-up truck.[11] Perry's counsel objected

---

[10]Relying on Apprendi, Perry also objects to the court's omission of any instruction requiring the jury to find a particular quantity of crack attributable to Perry. (Opening Brief at 23-24.) We addressed this alleged Apprendi error supra, "B.1. Alleged *Apprendi* Errors," and found it meritless.

[11]Apparently, Perry's truck was forfeited due to conduct that allegedly occurred on February 10, 1998. It appears that, on the advice of counsel, Perry did not contest that forfeiture.

twice to this line of cross-examination but the objections were overruled. Hayes

later conceded that he could have called her. The jury could not reach a verdict

on count 2, and the government subsequently dismissed the charge.

On appeal, Perry argues that the government's cross-examination of Hayes

constituted prosecutorial misconduct because it (1) was irrelevant and prejudicial

and (2) invaded attorney-client privilege. The government replies that its cross-

examination did not violate attorney-client privilege and was proper

impeachment. We conclude that the cross-examination does not rise to the level

of reversible error.

"An allegation of prosecutorial misconduct presents a mixed question of

fact and law that we review de novo." United States v. Ivy, 83 F.3d 1266, 1288

(10th Cir. 1996) (quotation marks omitted).[12]  When evaluating claims of

prosecutorial misconduct, we examine whether the conduct, first, was improper

and, second, warrants reversal. See id.

> A prosecutor's improper statement to the jury is harmless unless
> there is reason to believe that it influenced the jury's verdict. In
> assessing whether the misconduct had such an impact, we consider
> the trial as a whole, including the curative acts of the district court,
> the extent of the misconduct, and the role of the misconduct within

---

[12]We note that the standard of review is different if we are reviewing the trial court's denial of defendant's motion for a new trial due to prosecutorial misconduct. In that case, we review for abuse of discretion. See United States v. Gabaldon, 91 F.3d 91, 93-94 (10th Cir. 1996) (clarifying when each standard applies).

the case . . . . [T]o warrant reversal, the misconduct must have been flagrant enough to influence the jury to convict on grounds other than the evidence presented.

Id. (quotations, citations and brackets omitted).

First, it is clear that the government's cross-examination did not invade the privilege between Perry and his attorney. The prosecutor did not inquire into conversations between Perry and his attorney. Even if he had, moreover, had Perry disclosed to Hayes any part of those conversations, the privilege would have been lost as to those disclosures. Cf. United States v. Ryans, 903 F.2d 731, 741 n.13 (10th Cir. 1990) ("The attorney-client privilege is lost if the client discloses the substance of an otherwise privileged communication to a third party."). Moreover, while of arguable utility for impeachment, we cannot say the line of questioning was improper.

Second, we are confident the questioning does not warrant reversal. While the trial court did not give a curative instruction, the episode was isolated and forgettable when viewed against the backdrop of the entire case. Any marginal impact the prosecutor's questions might have had was vastly overshadowed by the massive evidence amassed against Perry. Furthermore, the testimony and questioning of Hayes weighed most heavily upon count 2, the count on which the jury deadlocked and which was subsequently dismissed.

Consequently, we conclude that the alleged prosecutorial misconduct does not warrant reversal.

## CONCLUSION

For the foregoing reasons, we AFFIRM on all issues.


ENTERED FOR THE COURT


David M. Ebel
Circuit Judge